# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

MELISSA A. DOUGHERTY,      :
                                     :
                Plaintiff     :     No. 3:16-CV-00196
                                     :
        vs.              :     (Judge Nealon)
                                     :
NANCY A. BERRYHILL, Acting   :
Commissioner of Social Security,[1]  :
                                     :
        Defendant    :

## MEMORANDUM

On February 4, 2016, Plaintiff, Melissa A. Dougherty, filed this instant

appeal[2] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner

of the Social Security Administration ("SSA") denying her applications for

disability insurance benefits ("DIB") and supplemental security income ("SSI")[3]

---

1. Nancy A. Berryhill became the new Acting Commissioner of Social Security on January 23, 2017. See http://blog.ssa.gov/meet-our-new-acting-commissioner/. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

3. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

under Titles II and XVI of the Social Security Act, 42 U.S.C. § 1461, et seq and 42 U.S.C. § 1381 et seq, respectively. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's applications for DIB and SSI will be vacated.

## BACKGROUND

Plaintiff protectively filed[4] her applications for DIB and SSI on June 11, 2010, alleging disability beginning on March 15, 2006, due to a combination of Bipolar Disorder and agoraphobia. (Tr. 26, 273).[5] These claims were initially denied by the Bureau of Disability Determination ("BDD")[6] on September 13, 2010. (Tr. 26). Plaintiff filed a written request for a hearing before an administrative law judge, and an initial oral hearing was held on November 8, 2011, before administrative law judge Marie Greener, ("ALJ"), who issued an unfavorable decision on December 15, 2011. (Tr. 27). After the Appeals Council

---

4. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

5. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on April 26, 2016. (Doc. 6).

6. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

2

remanded the ALJ's decision back to her for reconsideration, a remand hearing was held on April 17, 2014 before the ALJ. (Tr. 27). On July 22, 2014, the ALJ again issued an unfavorable decision, denying Plaintiff's applications for DIB and SSI. (Tr. 27). On August 5, 2014, Plaintiff filed a request for review with the Appeals Council. (Tr. 27). On December 6, 2015, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-7). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on February 4, 2016. (Doc. 1). On April 26, 2016, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 5 and 6). Plaintiff filed a brief in support of her complaint on June 10, 2016. (Doc. 7). Defendant filed a brief in opposition on July 11, 2016. (Doc. 8). Plaintiff did not file a reply brief.

Plaintiff was born in the United States on April 5, 1973, and at all times relevant to this matter was considered a "younger individual."[7] (Tr. 269). Plaintiff earned her GED in 1992, and can communicate in English. (Tr. 271, 274). Her

---

7. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

employment records indicate that she previously worked as a cashier, a "temp agency" employee, and a waitress. (Tr. 274). The records of the SSA reveal that Plaintiff had earnings in the years 1998 through 2005. (Tr. 258). Her annual earnings range from a low of one hundred thirty-four dollars and thirteen cents ($134.13) in 1994 to a high of twenty-five thousand one hundred seven dollars and seventy-six cents ($25,107.76) in 2001. (Tr. 258).

In a document entitled "Function Report - Adult" filed with the SSA on June 25, 2010, Plaintiff indicated that she lived in a house with her two (2) daughters and son. (Tr. 291). She noted that her daily activities included taking care of her children, cooking, cleaning, painting, using the computer, taking a nap for two (2) hours, bathing and getting her children ready for bed, and then going to bed. (Tr. 291). When she was having a "bad day," others would help her with these tasks. (Tr. 291). She indicated that, since her illnesses, injuries, and conditions began, she was no longer able to go outside "of [her] own area," shop, work, go to school functions or parent teacher conferences, go to her children's games, take her children to the doctor, or "just live a normal life." (Tr. 292). Aside from occasional panic attacks while showering, Plaintiff was able to take her of her personal needs. (Tr. 293). Her friend's daughter went to the grocery store for her, and Plaintiff stated that, if she did shop, she would drive at night

because there would be less people out.  (Tr. 293).

Regarding concentration and memory, Plaintiff did not need special reminders to take care of her personal needs, to go places, or to take her medicine. (Tr. 293, 295).  She could pay bills, handle a savings account, count change, and use a checkbook.  (Tr. 295).  She noted could not "remember things," needed to sometimes re-read written instructions, and needed to have spoken instructions sometimes repeated.  (Tr. 297).  She noted she had trouble remembering things and that stress or changes in schedule made her "more withdrawn."  (Tr. 298).

Socially, Plaintiff noted that she did not go anywhere on a regular basis, and was not able to go out alone if she was leaving "her area," in which case she would need someone to accompany her.  (Tr. 294, 296).  Her hobbies included painting, which she did every day.  (Tr. 295).  Regarding spending time with others, she spent time talking to others, and when asked how often, she noted it depended on her "mind state."  (Tr. 296).  She had problems getting along with family, friends, neighbors, authority figures, or others, explaining, "if I'm having an episode[,] can't talk, don't want anyone around me."  (Tr. 297).

1.    **Initial Oral Hearing**

During the initial oral hearing on November 8, 2011, Plaintiff testified that she was unable to work because she had a hard time sleeping and leaving her

5

house due to panic attacks, which were triggered by leaving home and being in open spaces. (Tr. 54, 63). She indicated the condition began two (2) years prior to her hearing, and included symptoms such as numbness and tingling, a faint feeling, a racing heart, and a feeling like she was going to die. (Tr. 56). She stated she was being treated by a therapist, but did not see a psychiatrist due to anxiety of "meeting new people." (Tr. 55). She also indicated that her condition caused highs and lows that lasted up to a couple of months. (Tr. 62). During the "lows," Plaintiff stated she had difficulty getting out of bed. (Tr. 62). She stated she had difficulty remembering things, like picking up her children, causing her daughter to call to remind her to pick her up from activities. (Tr. 62-63). She was taking prescribed medications for anxiety, including Geodon, Lexapro, and Valium, which she indicated helped "somewhat." (Tr. 55, 57).

She indicated that she lived in a house with her fourteen (14) year old daughter, four (4) year old daughter, and two (2) year old son, and that due to difficulty taking care of them and her home, friends in her neighborhood would help her do anything she needed done. (Tr. 51, 55-56). Her condition caused difficulty leaving home, as she indicated she was unable to go to her children's activities and school and could no longer go to the places she used to go, such as grocery stores and appointments. (Tr. 57). She indicated that she was fired from

her last job as a result of her panic attacks that caused difficulty getting across the parking lot due to the open space. (Tr. 59). She stated this difficulty getting across a parking lot caused her to stay in her car or to go home, which caused her to be either late to or absent from work, leading to termination of employment. (Tr. 59-60). She stated that, when she did make it to work at her last job, she would forget what she was supposed to do, had problems being with groups of people, and could not sit till for long. (Tr. 60). She stated she would have to "get up and walk around and get away from everybody" four (4) to five (5) times a day for up to twenty (20) minutes at a time. (Tr. 60). When people would correct her mistakes or remind her to do something, Plaintiff indicated she would react in an angry manner. (Tr. 61).

2. **Remand Hearing**

At her remand hearing held on April 17, 2014, Plaintiff testified that she had been attending appointments with Dr. Shah for her mental health impairments, for which she was taking prescribed medications, including Paxil, Lamictal, Trazadone, and Valium. (Tr. 76-77). Plaintiff stated that the medications were helpful, but that she experienced side effects, such as weight gains, memory problems, and violent episodes during sleep that she did not remember. (Tr. 77-78). She stated she was able to take care of her children, aged sixteen (16), seven

(7) and four (4) at the time of this hearing, at home, but was unable to their school functions or conferences due to the symptoms from her mental health impairments. (Tr. 79). Her anxiety symptoms included a racing heart, a "jello" feeling in her legs, and tingling and numbness; these feelings would last, on average, for forty-five (45) minutes and were helped by Valium. (Tr. 81-82). Her depression occurred in the wintertime and when it rained and made her feel like she did not want to do anything except sleep. (Tr. 83). Her Bipolar Disorder caused mood swings that caused her to be "very mean;" manic phases that caused spontaneity, dangerous impulsivity, and an inability to sleep; and depressed phases, which lasted longer than manic phases. (Tr. 84-85). Plaintiff also had Post-Traumatic Stress Disorder, ("PTSD"), which caused "almost daily" flashbacks to past trauma, nightmares, and a dazed feeling. (Tr. 86). Overall, her mental health symptoms at the time of the remand hearing included being unsocial, violent, and having feelings that she would hurt someone if she left her house. (Tr. 80-81). She testified that these feelings caused her to get into at least twelve (12) altercations with people such as her family members, neighbors, and psychiatrist. (Tr. 87-88).

## MEDICAL RECORDS

### A.    Medical Records

#### 1.    Ryan Little, NP

From November 24, 2008 through October 27, 2011, Plaintiff had a serious

of appointments with Brian Little, NP, for Anxiety Disorder, Panic Disorder

(Moderate to Severe), Depression, Manic-Depressive Psychosis (Chronic), and

Bipolar Disorder.  (Tr. 379-416, 468-508).  The medications Plaintiff took for

these mental health impairments included Lexapro, Vistaril, Buspar, Diazepam,

Seroquel, and Geodon.  (Tr. 386, 389, 393, 398, 403, 408, 413, 416, 469, 473-474,

476-477, 482-483, 485-486, 489-490, 494, 498).  Her overall self-reported

symptoms of these diseases included anxiety, panic attacks, fatigue, lack of

appetite, social phobias, agorabphobia, fearfulness, irritability, chest pain, heart

palpitations, manic episodes, mood swings, lack of interest, low self-esteem, poor

concentration, indecisiveness, restlessness, sluggishness, sleep disturbances,

dizziness, frustration, and feelings of guilt and worthlessness.  (Tr. 379, 383, 388,

393, 397, 401, 402, 404, 407-408, 411, 414, 468,472, 476, 480, 484, 488, 492,

496).  Examinations were typically negative for euphoria, paranoia, obsessive-

compulsive behaviors, suicidal thoughts, and hallucination.  (Tr. 386, 390, 395,

399, 403, 407-408, 412, 414, 470, 474, 478, 482, 486, 490, 498).  Examinations

were typically positive for poor insight and judgment, mood swings, agitation, fearfulness, irritability, poor attention span and concentration, compulsive behavior, and anxiety.  (Tr. 386, 390, 399, 402, 470, 474, 478, 482, 486, 490, 498).

### 2. Tri County Human Services Center

From March 30, 2006 through May 12, 2006, Plaintiff attended seven (7) appointments at Tri County Human Services Center for her mental health impairments.  (Tr. 442-456).  Plaintiff's self-reported symptoms included mood fluctuations, a decreased appetite, poor sleep, increased fatigue, and hypersensitivity.  (Tr. 452).  A mental status examination revealed a depressed and anxious mood with an appropriate affect; average intellect; fair insight and judgment; and attention, memory, and concentration grossly within normal limits.  (Tr. 453, 455-456).  It was noted that her primary diagnosis was Major Depressive Disorder and Panic Disorder without Agoraphobia.  (Tr. 449, 452, 456).  The medications she was taking at that time were listed as Zoloft and Xanax.  (Tr. 452).

### 3. Arun Shah, M.D., Psychiatrist

From March 15, 2013, to December 31, 2013, Plaintiff attended appointments with treating psychiatrist Dr. Shah for her mental health

impairments. (Tr. 512-513, 542-553). Plaintiff's self-reported symptoms included leg numbness, feelings that she would die, panic attacks, a racing heart, grogginess, a decreased appetite, difficulty sleeping, fear of leaving home, and disorientation. (Tr. 513, 542-553). Plaintiff's mental status examinations revealed: fleeting thoughts; a cooperative attitude; coherent and relevant thought content; normal speech; judgment and memory ranging from fair to good; "zoned out" to fair concentration; a "down" mood; and a casual appearance. (Tr. 513, 542-553). Dr. Shah diagnosed Plaintiff with Anxiety with Agoraphobia, Bipolar Disorder, PTSD, and Panic Disorder. (Tr. 512-513, 542-553). Dr. Shah prescribed medications, including Paxil, Lamictal, Valium, and Trazadone. (Tr. 542-553). Plaintiff was consistently listed as "fair" in relation to her diganoses. (Tr. 542-553).

### B. **Medical Opinions**

#### 1. **Sara Long, Ph.D- Consultative Examiner**

On July 23, 2010, Plaintiff underwent a psychiatric evaluation performed by consultative examiner Sara Long, Ph.D. (Tr. 374). It was noted that Plaintiff had one (1) prior psychiatric hospitalization for depression that occurred in 2006 and was taking Diazepam and Citalopram at the time of her appointment. (Tr. 374). Plaintiff reported she took care of her grooming, cooked, cleaned, painted, and did

the laundry. (Tr. 375-376). She had difficulty shopping, but stated she would be "ok" if no people were in the store; however, she also noted that she "can't do big, open space." (Tr. 376). Her family relationships were noted as "strained." (Tr. 376). Her mental status examination revealed: appropriate eye contact; fluent and clear speech with adequate, receptive, and expressive languages; coherent and goal-directed thought processes with no indication of any sensory or thought disorder; a full range of appropriate affect in speech and thought content; a euthymic mood; a clear sensorium; accurate completion of serial threes; average intellect with limited fund of information; and poor insight and judgment. (Tr. 375). Her Axis I diagnoses included Anxiety Disorder, not otherwise specified; Polysubstance Abuse, in remission; and Substance Abuse, in early remission. (Tr. 376). Dr. Long recommended Plaintiff attend psychotherapy; stated Plaintiff's prognosis was good, given appropriate psychotherapy and motivation to acquire skills. (Tr. 376-377). Dr. Long opined Plaintiff was able to: follow and understand simple directions and instructions; perform simple tasks independently; maintain attention and concentration; maintain a regular schedule; independently learn new tasks; learn new tasks; make appropriate decisions; relate adequately with others; and manage stress adequately. (Tr. 376). Dr. Long also opined that Plaintiff's psychiatric problems may, at times, interfere with her ability

to function on a regular basis due to Plaintiff's self-reported problems with people and open spaces, the need to "do things spontaneously," and impulsivity.  (Tr. 376).

### 2.    T. Harding, Psy.D.

On September 10, 2010, Dr. Harding performed a Psychiatric Review Technique and completed a Mental Residual Functional Capacity Assessment form for Plaintiff.  (Tr. 419-435).  Dr. Harding opined, in the Pyschiatric Review Technique, that while Plaintiff had disorders that fell under Impairments Listings 12.06, Anxiety Disorders, and 12.09, Substance Abuse Disorders, these impairments did not meet the "B" or "C" criteria for either Listing.  (Tr. 429-430).  Dr. Harding opined that, for the "B" criteria, Plaintiff had moderate restriction of activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration.  (Tr. 429).

In the Mental Residual Functional Capacity Assessment form, based on Plaintiff's mental records up to that date, Dr. Harding opined that Plaintiff was moderately limited in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to respond appropriately to changes in the work setting; and to travel in unfamiliar places or use public transportation. (Tr. 433-434).

### 3. Ryan Little, FNP

On November 7, 2011, Ryan Little, NP, completed a Psychiatric/ Psychological Impairment Questionnaire. (Tr. 501). He listed Plaintiff's Axis I diagnosis as Anxiety Disorder with Agoraphobia and her Axis II diagnosis as Social Anxiety with a prognosis from poor to fair. (Tr. 501). He listed the clinical findings that supported these diagnoses, including: sleep and mood disturbances; emotional lability; recurrent panic attacks; social withdrawal; decreased energy; generalized persistent anxiety; severe social anxiety; and agoraphobia. (Tr. 502). Ryan Little opined Plaintiff was: (1) mildly limited in the ability to remember locations and work-like procedures and to understand and remember detailed instructions and carry out one (1) or two (2) step instructions; (2) moderately limited in the ability to carry out detailed instructions and to ask simple questions or request assistance; and (3) markedly limited in the ability to maintain attention and concentration for extended periods, to perform activities within a schedule,

maintain regular attendance, and be punctual within customary attendance, to make simple work-related decisions, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to respond appropriately to changes in the work setting, and to be aware of normal hazards and take appropriate precautions. (Tr. 504-506). Ryan Little also opined Plaintiff was incapable of "low stress" jobs because she could not focus on simple tasks or have social interactions without psychological complications and would be absent form work more than three (3) times a month due to the mental health impairments. (Tr. 507-508).

### 4.    Dr. Shah- Treating Psychiatrist

On May 13, 2013, Dr. Shah completed a Psychiatric/ Psychological Impairment Questionnaire. (Tr. 514-521). He diagnosed Plaintiff with PTSD, Bipolar Disorder, and Panic Disorder, and opined that her prognosis was fair to guarded. (Tr. 514). The medications she was taking for these impairments included Paxil, Lamictal, Valium, and Trazadone. (Tr. 519). Dr. Shah based his diagnoses on the following symptoms: sleep and mood disturbances; personality changes; emotional lability; past substance abuse; recurrent panic attacks; psychomotor agitation; social withdrawal; manic episodes; intrusive recollections

of a traumatic experience; persistent irrational fears; generalized persistent anxiety; and hostility and irritability. (Tr. 515). He noted Plaintiff's primary symptoms to be mood swings, anxiety with panic and phobia, and agoraphobia. (Tr. 516). He opined that Plaintiff was: (1) mildly limited in the ability to remember locations and work-like procedures, to understand, remember, and carry out one (1) to two (2) step instructions, to sustain ordinary routine without supervision, to make simple work-related decisions, to respond appropriately to changes in the work setting, and to set realistic goals or make plans independently; (2) moderately limited in the ability to understand, remember, and carry out detailed instructions and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and (3) markedly limited in the ability to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to work in coordination with or proximity to others without being distracted by them, to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and to travel to unfamiliar places or use public

transportation. (Tr. 517-519). He opined that Plaintiff's impairments would last at least twelve (12) months; that Plaintiff was capable of tolerating low work stress; and that Plaintiff would be absent more than three (3) times a month from work as a result of her impairments. (Tr. 519-521).

On March 28, 2014, Dr. Shah, completed a second Psychiatric/ Psychological Impairment Questionnaire. (Tr. 555-561). He listed Plaintiff's Axis I diagnoses as Bipolar II Disorder and PTSD and her Axis II diagnosis as Panic Disorder and listed Plaintiff's prognosis from fair to guarded. (Tr. 555). He listed the clinical findings that supported these diagnoses, including: appetite, sleep, and mood disturbances; personality changes; emotional lability; recurrent panic attacks; anhedonia or pervasive loss of interests; psychomotor agitation; social withdrawal; manic episodes; intrusive recollections of a traumatic experience; persistent irrational fears; generalized persistent anxiety; and hostility and irritability. (Tr. 556). He noted Plaintiff's primary symptoms were mood swings, a temper, anxiety, panic attacks, phobias, and flashbacks. (Tr. 557). He opined that Plaintiff was: (1) mildly limited in the ability to remember locations and work-like procedures, to understand, remember, and carry out one (1) to two (2) step instructions, to sustain ordinary routine without supervision, and to set realistic goals or make plans independently; (2) moderately limited in the ability to

17

understand, remember, and carry out detailed instructions and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and (3) markedly limited in the ability to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to work in coordination with or proximity to others without being distracted by them, to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and to travel to unfamiliar places or use public transportation. (Tr. 558-559). He opined that Plaintiff's impairments would last at least twelve (12) months; that Plaintiff was capable of tolerating low work stress; and that Plaintiff would be absent more than three (3) times a month from work as a result of her impairments. (Tr. 560-561).

### 5.     Cheryl Loomis, Ph.D, Consultative Examiner

On August 27, 2013, consultative examiner Dr. Loomis performed a psychiatric evaluation of Plaintiff. (Tr. 523). Plaintiff reported that she: had difficulty sleeping and a loss of appetite; felt sad and restless most days; had mood

instability; and had muscle tension, flashbacks, and nightmares from prior childhood sexual abuse from four (4) different family members. (Tr. 523-524). Plaintiff's mental status examination revealed: poor grooming and eye contact; fluent and clear speech with adequate expressive and receptive languages; coherent and goal-directed thought processes; a dysphoric and depressed affect and dysthymic mood; clear sensorium; moderately impaired attention and concentration; impaired recent and remote memory skills; below average cognitive functioning; and poor insight and judgment. (Tr. 524-525). Plaintiff reported she groomed herself, cooked, cleaned, and did the laundry, but that she had help from her boyfriend due to lack of motivation; that her boyfriend did the shopping due to her anxiety; denied socializing with anyone, but had a good relationship with her children; and spent her days watching television and reading. (Tr. 525). Dr. Loomis listed Plaintiff's Axis I diagnosis as PTSD and her Axis II diagnosis as Personality Disorder with borderline and histrionic features and listed her prognosis as guarded. (Tr. 526). Dr. Loomis opined Plaintiff was: (1) moderately impaired in the ability to perform simple tasks independently or under supervision; (2) markedly impaired in the ability to maintain attention and concentration, perform complex tasks independently or under supervision, make appropriate decisions, relate adequately with others, and appropriately deal with stress; and (3)

had no impairment in the ability to follow and understand simple directions and instructions, maintain a regular schedule, or learn new tasks. (Tr. 526).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520,

1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence.  <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-07.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.  Id.  As part of step four, the Commissioner must determine the claimant's residual functional capacity.  Id.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one through four."  Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a

discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945;

Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that

which an individual is still able to do despite the limitations caused by his or her

impairment(s).").

"At step five, the burden of proof shifts to the Social Security

Administration to show that the claimant is capable of performing other jobs

existing in significant numbers in the national economy, considering the

claimant's age, education, work experience, and residual functional capacity. "

Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir.

2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status

requirements of the Social Security Act through the date last insured of December

31, 2010.  (Tr. 29).  At step one, the ALJ found that Plaintiff had not engaged in

substantial gainful work activity from her alleged onset date of March 15, 2006.

(Tr. 29).

At step two, the ALJ determined that Plaintiff suffered from the severe[8]

_____

8.  An impairment is "severe" if it significantly limits an individual's ability to
perform basic work activities.  20 C.F.R. § 404.921.  Basic work activities are the
abilities and aptitudes necessary to do most jobs, such as walking, standing,

combination of the following impairments: "affective disorder and anxiety disorder (20 C.F.R. 404.1520(c) and 20 C.F.R. 416.920(c))." (Tr. 29-30).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (Tr. 30-32).

At step four, the ALJ determined that Plaintiff had the RFC to a full range of work at all exertional levels with limitations. (Tr. 32-38). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, I find that [Plaintiff] has the [RFC] to perform a full range of work at all exertional levels. She is able to perform work that does not require more than simple, short interactions with supervisors, coworkers, or the public. Although [Plaintiff] is able to work in proximity to others, the tasks should not require working in conjunction with others and predominantly involve working with objects rather than people. She is limited to routine daily tasks and duties in the same workplace, which do not significantly change in pace or location on a daily basis.

(Tr. 32).

───────────────────

sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

The ALJ concluded, based on the testimony provided by the vocational expert at the remand hearing, that Plaintiff was capable of performing past relevant work as a circuit board solderer, stating, "This work does not require the performance of work-related activities precluded by [Plaintiff]'s [RFC] (20 CFR 404.1565 and 416.965)." (Tr. 38-40).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between March 15, 2006, the alleged onset date, and the of the ALJ's decision. (Tr. 40).

## DISCUSSION

On appeal, Plaintiff asserts that the ALJ's RFC determination is not supported by substantial evidence. (Doc. 7, pp. 16-22). Defendant disputes this contention. (Doc. 8, pp. 15-22).

### 1. Residual Functional Capacity Determination

Plaintiff asserts the ALJ's RFC determination is not supported by substantial evidence because she ignored the portions of several opinions that Plaintiff would be unable to meet acceptable attendance requirements did not afford the opinions of Dr. Shah proper weight, and instead substituted her own lay opinion for that of the medical opinions rendered in determining the RFC. (Doc. 7, pp. 16-22).

The responsibility for deciding a claimant's RFC rests with the administrative law judge.   See 20 C.F.R. § 404.1546.  It is recognized that the RFC assessment must be based on a consideration of all the evidence in the record, including the testimony of the Plaintiff regarding activities of daily living, medical records and opinions, lay evidence, and evidence of pain.  See Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 121-122 (3d Cir. 2000).  The Commissioner's regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairment(s), including a claimant's symptoms, diagnosis and prognosis, what a claimant can still do despite impairments(s), and a claimant's physical or mental restrictions."  20 C.F.R. §404.1527(a)(2).  Regardless of its source, the ALJ is required to evaluate every medical opinion received.  20 C.F.R. §404.1527(c).

In arriving at the RFC, an administrative law judge should be mindful that the preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits.  See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time."

Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR §

416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you

and the more times you have been seen by a treating source, the more weight we

will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-

treating, non-examining physician's opinion, the ALJ may choose whom to credit

in his or her analysis, but "cannot reject evidence for no reason or for the wrong

reason." Morales, 225 F.3d 316-18. It is within the ALJ's authority to determine

which medical opinions he rejects and accepts, and the weight to be given to each

opinion. 20 C.F.R. § 416.927. The ALJ is permitted to give great weight to a

medical expert's opinion if the assessment is well-supported by the medical

evidence of record.

Pursuant to Social Security Regulation 96-6p, an administrative law judge

may only assign less weight to a treating source opinion based on a non-treating,

non-examining medical opinion in "appropriate circumstances." SSR 96-6p, 1996

SSR LEXIS 3. This regulation does not define "appropriate circumstances," but

gives an example that "appropriate circumstances" exist when a non-treating, non-

examining source had a chance to review "a complete case record . . . which

provides more detailed and comprehensive information than what was available to

the individual's treating source." Id. (emphasis added).

Regardless of the weight an administrative law judge affords to medical opinions, the administrative law judge has the duty to adequately explain the evidence that he or she rejects or affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000).

Additionally, in choosing to reject the evaluation of a treating physician, an ALJ may not make speculative inferences from medical reports and may reject the treating physician's opinions outright only on the basis of contradictory medical evidence. Morales, 225 F.3d at 316-18. An ALJ may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation, or lay opinion. Id. An ALJ may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. See Doak v. Heckler, 790 F.2d 26, 29 (3d Cir. 1986) ("No physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); 20 C.F.R. § 404.1545(a).

As two commentators have explained:

> Sometimes administrative law judges assert that they - and not physicians - have the right to make residual functional capacity determinations. In fact, it can reasonably be asserted that the ALJ has the right to determine whether a claimant can engage in sedentary, light, medium, or heavy work. The ALJ should not assume that physicians know the Social Security Administration's definitions of those terms. However, the underlying determination is a medical determination, i.e., that the claimant can lift five, 20, 50, or 100 pounds, and can stand for 30 minutes, two hours, six hours, or eight hours. That determination must be made by a doctor. Once the doctor has determined how long the claimant can sit, stand or walk, and how much weight the claimant can lift and carry, then the ALJ, with the aid of a vocational expert if necessary, can translate that medical determination into a residual functional capacity determination. Of course, in such a situation a residual functional capacity determination is merely a mechanical determination, because the regulations clearly and explicitly define the various types of work that can be performed by claimants, based upon their physical capacities.

Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Courts, 287-88 (2011) (emphasis added). The administrative law judge cannot speculate as to a claimant's residual functional capacity, but must have medical evidence, and generally a medical opinion regarding the functional capabilities of the claimant, supporting his or her determination. Doak, 790 F.2d at 29 ; see Snyder v. Colvin, 2017 U.S. Dist. LEXIS 41109 (M.D. Pa. March 22, 2017) (Brann, J.) ("I find that substantial evidence does not support the ALJ's ultimate determination. The ALJ's decision to discredit, at least partially, every opinion of every medical doctor's RFC assessment of Snyder left the ALJ without a single medical opinion to rely upon in reaching a RFC determination. 'Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant.' Maellaro v. Colvin, Civ. No. 3:12-01560, 2014 U.S. Dist. LEXIS 84572, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014)."); Washburn v. Colvin, 2016 U.S. Dist. LEXIS 144453 (M.D. Pa. October 19, 2016) (Conner, J.); Wright v. Colvin, 2016 U.S. Dist. LEXIS 14378, at *45-46 (M.D. Pa. Jan. 14, 2016) (Rambo, J.) ("Chandler stated that an ALJ need not obtain medical opinion evidence and was not bound by any treating source medical opinion. Id. However, both these statements are dicta. In Chandler, the ALJ had medical

opinion evidence and there was no contrary treating source opinion. Id.

'[D]ictum, unlike holding, does not have strength of a decision 'forged from actual experience by the hammer and anvil of litigation.' . . . the only precedential holding in Chandler is the unremarkable finding that an ALJ may rely on a state agency medical opinion that the claimant is not disabled when there are no medical opinions from treating sources that the claimant is disabled. See Chandler, 667 F.3d at 361-63. . . . Consequently, with regard to lay reinterpretation of medical evidence, Frankenfield, Doak, Ferguson, Kent, Van Horn, Kelly, Rossi, Fowler and Gober continue to bind district Courts in the Third Circuit."); Maellaro v. Colvin, 2014 U.S. Dist. LEXIS 84572, at *32-34 (M.D. Pa. June 18, 2014) (Mariani, J.) ("The ALJ's decision to reject the opinions of Maellaro's treating physicians created a further issue; the ALJ was forced to reach a residual functional capacity determination without the benefit of any medical opinion. Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. *See Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986) ("No physician suggested that the activity [the claimant] could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."). *See*

*also Arnold v. Colvin*, 3:12-CV-02417, 2014 U.S. Dist. LEXIS 31292, 2014 WL 940205, at *4 (M.D. Pa. Mar. 11, 2014); *Gormont v. Astrue*, 3:11-CV-02145, 2013 U.S. Dist. LEXIS 31765, 2013 WL 791455, at *7 (M.D. Pa. Mar. 4, 2013); *Troshak v. Astrue*, 4:11-CV-00872, 2012 U.S. Dist. LEXIS 137945, 2012 WL 4472024, at *7 (M.D. Pa. Sept. 26, 2012). The ALJ's decision to discredit, at least partially, every residual functional capacity assessment proffered by medical experts left her without a single medical opinion to rely upon. For example, three physicians opined that Maellaro was limited in some way in his ability to stand and/or walk: Dr. Dittman opined that Maellaro could stand/walk for less than one hour, Dr. Singh believed that Maellaro could stand/walk for fewer than two hours, and Dr. Dawson opined that Maellaro could not stand or walk for any length of time. Tr. 183, 211, 223. In rejecting these three opinions, there were no other medical opinions upon which the ALJ could base her decision that Maellaro essentially had no limitations in his ability to stand or walk. Tr. 283. Consequently, the ALJ's decision to reject the opinions of Drs. Singh and Dawson, and the ALJ's determination of Maellaro's residual functional capacity, cannot be said to be supported by substantial evidence."); Gunder v. Astrue, Civil No. 11-300, slip op. at 44-46 (M.D. Pa. Feb. 15, 2012) (Conaboy, J.) (Doc. 10) ("Any argument from the Commissioner that his administrative law judges can set the

residual function capacity in the absence of medical opinion or evidence must be rejected in light of <u>Doak</u>. Furthermore, any statement in <u>Chandler</u> which conflicts (or arguably conflicts) with <u>Doak</u> is *dicta* and must be disregarded. <u>Government of Virgin Islands v. Mills</u>, 634 F.3d 746, 750 (3d Cir. 2011) (a three member panel of the Court of Appeals cannot set aside or overrule a precedential opinion of a prior three member panel). "); <u>Dutton v. Astrue</u>, Civil No. 10-2594, slip op. at 37-39 (M.D. Pa. Jan. 31, 2012) (Munley, J.) (Doc. 14); <u>Crayton v. Astrue</u>, Civil No. 10-1265, slip op. at 38-39 (M.D. Pa. Sept. 27, 2011) (Caputo, J.) (Doc. 17).

In the case at hand, the ALJ gave some weight to the above-noted opinions of Dr. Long, Dr. Loomis, and Dr. Harding, and gave little weight to the opinion of Plaintiff's treating psychiatrist, Dr. Shah. (Tr. 34 -38). Plaintiff argues that, in doing so, the ALJ improperly substituted her own opinion in place of the opinions of Dr. Long, Dr. Loomis, and Dr. Shah for limitations in Plaintiff's attention, concentration, and attendance. (Doc. 7, pp. 16-22). To reiterate, Dr. Long opined that Plaintiff's psychiatric problems may, at times, interfere with her ability to function on a regular basis due to Plaintiff's self-reported problems with people and open spaces, the need to "do things spontaneously," and impulsivity. (Tr. 376). Dr. Loomis opined Plaintiff was markedly impaired in the ability to maintain attention and concentration. (Tr. 526). Dr. Shah, Plaintiff's treating

psychiatrist, twice opined Plaintiff: (1) was markedly limited in the ability to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to complete a normal workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods; and (2) would be absent from work more than three (3) times a month due to her mental health impairments. (Tr. 517-521, 558-561).

This Court agrees with Plaintiff that substantial evidence does not support the ALJ's RFC determination that excluded any limitations regarding attention, concentration, and attendance limitations as opined by Dr. Long, Dr. Loomis, and Dr. Shah. (Tr. 376, 517-521, 526, 558-561). This Court cannot ascertain from the analysis conducted by the ALJ how she was able to determine a residual functional capacity that excluded limitations involving attention, concentration, and attendance. The fact that the ALJ gave no weight to the portions of the opinions of Dr. Long and Dr. Loomis and only little weight to the two (2) opinions of Dr. Shah that address these limitations and markedly limit Plaintiff's concentration, attention, and attendance, but then implicitly arrives at an RFC devoid of acknowledgment of these limitations, suggests that the ALJ improperly

reinterpreted the medical evidence in arriving at the RFC determination because the record provides no other evidence to support this conclusion.   See Snyder, 2017 U.S. Dist. LEXIS 41109 at *13-14 ("The ALJ failed to point to any specific medical evidence that would support a contrary opinion on Snyder's standing/walking capabilities, and as a result, it appears that the ALJ was forced to reach a RFC determination without the benefit of any medical opinion. Accordingly, the ALJ's conclusion is not supported by substantial evidence."). There was only one (1) other opinion or record addressing Plaintiff's attention and concentration, which was that of Dr. Harding, who stated Plaintiff had no limitations with attention and concentration, and the ALJ gave that portion of the opinion no weight.  Similarly, and more importantly, without the support of any opinions of record, the ALJ discredited the opinions of Dr. Long and Dr. Shah that Plaintiff would have attendance issues due to the interference Plaintiff's mental health impairments caused regarding her ability to function at a basic level and that Plaintiff would be absent more than three (3) times a month, precluding any employment per the VE's testimony.  (Tr. 95-96, 517-521, 526, 558-561). Therefore, because the ALJ substituted her own opinion for that of the opinions of three (3) different physicians who opined that Plaintiff had marked limitations in concentration and attention and would have attendance issues rendering her unable

to meet demands of any employment according to the VE's testimony, remand is warranted pursuant to 42 U.S.C. § 405(g).

This Court declines to address Plaintiff's remaining allegations of error, as remand may produce a different result on this claim, making discussion of them moot. Burns v. Colvin, 156 F. Supp. 3d 579, 598 (M.D. Pa. Jan. 13, 2016); see LaSalle v. Comm'r of Soc. Sec., Civ. No. 10-2011 U.S. Dist. LEXIS 40545, 1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision of the Commissioner will be vacated, and the matter will be remanded to the Commissioner of the Social Security Administration.

A separate Order will be issued.

**Date**: September 29, 2017

**/s/ William J. Nealon**
**United States District Judge**